LEARY v. CITY OF NEW YORK et al.

THE G–4.

No. 16492.

District Court, E. D. New York.

Aug. 16, 1943.

Hagen & Eidenbach of New York City (Charles W. Hagen, of New York City, of counsel), for libellant.

Robert H. Schaffer, Acting Corp. Counsel of New York City (Herbert Lee, Asst. Corp. Counsel, of New York City, of counsel), for respondent City of New York.

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Belford, of New York City, of counsel), for respondent-impleaded Moran Towing & Transportation Co.

**CAMPBELL, District Judge.**

Moran Towing & Transportation Company, Inc., was on the petition of the respondent, the City of New York, impleaded under Rule 56 in Admiralty, 28 U.S.C.A. following section 723.

This is an action on a contract of charter.

On October 21, 1940, the Dump Scow "G–4", owned by the libellant, George Leary, Jr., was delivered to the City of New York, pursuant to a written contract of charter. The said contract of charter was City of New York Contract No. 2298, Class 3 (Ex. 1).

The scow remained in the possession of the City of New York under this contract of charter, until on or about March 13, 1941, at which time it was returned to libellant.

An ingoing survey was held on the scow at the time of delivery to the City of New York (Ex. 3), and an outgoing survey was held after the return of the scow to the libellant (Ex. 2). Both surveys were attended by representatives of the City of New York, and the owner.

The outgoing survey disclosed that the scow "G–4" had sustained damage, in addition to the damage found on the ingoing survey, while under charter to the City of New York. The additional damage, so found, was not the result of ordinary wear and tear.

The scow "G–4" was a vessel, without motive power, and the charter and delivery of the scow to the City of New York amounted to a demise thereof.

The charter being a demise charter, the City of New York, the respondent, was required to return the vessel in the same good order, and condition, as when received, ordinary wear and tear excepted.

The libellant made out a prima facie case by showing that the scow was not returned in the same condition as when received, but in a damaged condition. This was conclusively shown by the ingoing and outgoing surveys, excepting from the outgoing survey the damages noted on the incoming survey and the damages shown by the survey of damages inflicted by the

Samson for which the respondent was not responsible.

■ To relieve itself from liability, the charterer, the respondent, the City of New York, was bound to establish that the damages resulted through no neglect of the said respondent. Tomkins Cove Stone Co. v. Bleakley Transp. Co., Inc., et al., 3 Cir., 40 F.2d 249; Eureka No. 70, 2 Cir., 15 F.2d 366, 1926 A.M.C. 1668; C. F. Harms Co. v. Upper Hudson Stone Co., 2 Cir., 234 F. 859.

In its attempt to show that the damages resulted through no neglect of the charterer, Captain McCarthy, Captain of the Dredge Grabit, read many items from the dredge's log. That was the dredge from which the material was loaded on the Dump Scow "G–4".

The log of the Grabit was of course self-serving, but notwithstanding that fact, in no entry, that was read, was there any explanation of the way in which the damage occurred. Further, we must not lose sight of the fact that Captain McCarthy admitted, on cross-examination, that he did not make entries in the log of damages caused by the dredge.

The most that was disclosed by the log was, that on several occasions the Dump Scow "G–4" was not towed, because of weather conditions. The evidence shows that on those days no dump scows were towed to sea by Moran.

■ The fact that the "G–4" leaked on several occasions seems to me to be immaterial, as it is common knowledge that all wooden scows, and especially dump scows, leak.

There is no claim made in this action for sinking damage, nor does the evidence show that the "G–4" did sink.

The damages shown by the outgoing survey, for which claim is made herein, are for broken planks, timbers and pockets, and these could only have been caused by negligence and violent contact.

■ The respondent, the City of New York, has failed to sustain its burden and show, by convincing evidence, that it was free from neglect.

The respondent, the City of New York, bases its defense on a collateral attack on the condition of the scow "G–4".

The City attempted to show that the scow "G–4" was unsuitable for the work required to be done, and was unseaworthy.

■ Of course, the warranty of seaworthiness is implied.

■ Expert testimony was given on both sides, but I am convinced, and agree with libellant's expert, Captain DeMars, that the "G–4" was seaworthy when turned over to the respondent, the City of New York, on the charter.

The "G–4" was well known to the City of New York, having been under charter to it on other occasions.

When the "G–4" went on charter on the occasion in question, an ingoing survey was made by two competent surveyors, who found her to be suitable for the work required to be done.

The acceptance, by the surveyors, of the "G–4" as suitable for the work to be done, of course, is not a binding waiver by the respondent of the warranty of seaworthiness, but the acceptance of the "G–4" by the respondent's surveyors, in view of Article 13 of the Contract, constituting the charter, which provides that no scows shall be accepted by the City unless they are adequate for the purpose and not leaking, furnishes strong evidence of the seaworthiness of the "G–4" when she entered on the charter, and carries greater weight than the testimony of the experts called by the City, who had not seen the "G–4" until after she had been damaged by the City, and testified that she was unseaworthy from the inception of the charter.

This is not, in any way, weakened by the statement in the incoming survey, "With the exception of the above items, the scow is in seaworthy condition."

This follows a statement of the items referred to as to no one of which claim is made in this action, and the damages for which recovery is sought in this action were not caused by reason of any of them.

Section H on page 30 of the contract (Ex. 1), constituting the charter, provides in part: "H. The Engineer shall inspect all the labor, tugs and scows furnished for the performing of any work under this contract, and is authorized and empowered to reject and refuse all labor, tugs and scows, or any part thereof so furnished under this contract, that do not comply in all respects with the specifications. * * *"

The City did not reject the scow "G–4", nor did it, at any time during the charter period, make any complaint about the condition of the scow.

This is further evidence of the seaworthiness of the "G–4" at the time she entered on charter, and entitled to much greater weight than the claim of unseaworthiness first made, when alleged as a defense in this action, in an effort to escape liability.

The City makes further claim that it is not liable under provisions of the contract, constituting the charter.

I construed and interpreted the provisions of the said contract, in my opinion in Dump Scow Z–1, George Leary, Jr., v. City of New York,[1] but, as the respondent relies on what its claims are charter breaches by the libellant, I will again consider the same.

Article 21, page 55 of the contract, provides: "The Contractor guarantees that all scows offered and delivered by him for use by The City are in all respects fit and suitable for the use for which they are intended to be used by The City and can be safely and efficiently operated in the work of dredging contemplated by this contract and in the disposal of such dredged materials at sea, and also that all such scows comply fully with all the requirements of these specifications. The Contractor assumes all liability for the non-fitness or the unsuitability of such scows for the use intended and for the lack of, or defect in, or the inability to efficiently and safely operate, of any and all equipment and apparatus required or necessary in the proper, safe and efficient operation of the scows in the work of dredging and disposal at sea of the dredged materials."

The libellant, contractor, did not breach that article, but, as I have found, fully complied with that article, and furnished a scow fit and suitable for the intended use.

Article 19, page 54 of the contract, provides that the City shall not be liable at any time for any damages or claims against it, due to, or caused through, or by supplying of defective apparatus, or equipment of any kind whatsoever for the operation of tugs or scows, but that the contractor assumes all liability therefor. That article requires no extended consideration, for the reason that, as I have found, as to Article 21, the libellant, contractor, did not furnish a defective scow, but did fully comply with the contract, and furnished a scow fit and suitable for the intended use.

Article K, page 32 of the contract, in part, provides as follows: "The Contractor shall give his personal attention constantly to the faithful prosecution of the work; * * *."

The libellant, contractor, did not breach that article. The article in question is a general one, including other classes than the mere furnishing of scows, where personal attention is required. The libellant fully complied with that article. He furnished a scow suitable for the purposes intended, and could not control its use and operation by the respondent, the City of New York.

Article 23, page 56 of the contract, in part, provides as follows: "Each scow shall be manned by a competent and efficient scowman to be furnished and paid by the Contractor, for operating and handling of such scow while engaged on the work or while being towed from place to place or to sea and return from sea and for the proper dumping of such scow upon reaching the dumping ground, and for closing and making fast the doors of such scow after dumping at sea, and for the doing of all other necessary work requisite to the proper operating and handling of such scow."

The libellant, contractor, did not breach that article of the contract. He furnished a competent Captain, and there is no proof that any damage was caused by any fault or neglect on the part of the Captain of said scow.

Paragraph H, page 31 of the contract, in part, provides as follows:

"No claim upon the department shall be made for any damage done to the scow while towing. No claim shall be considered, unless the damage has been reported at the time it was incurred, by the Captain of the scow to the Captain of the dredge and duly recorded by the Captain of the dredge upon his log."

"All damages to scows under charter to this Department, received while in tow, on the work, or from any cause whatsoever, shall be reported by the contractor's employees in writing, which shall state the time and place, nature and extent of damage and the cause thereof, and copies of such reports shall be furnished to this Department within sixty hours after their receipt by the contractor."

---

[1] No opinion for publication.

■ The libellant, contractor, did not breach that article of the contract. No claim is made for damage while towing, and the Captain of the dredge said damages by the dredge to scows working with it were not entered in the log. Those provisions relate only to the adjustment of claims by the Commissioner without suit. It limits the authority of the Commissioner to settle only such claims as are matters of record on the log of the City's dredge. It does not deprive the owner of his legal remedies. Port Jervis Water Works Co. v. Village of Port Jervis, 151 N.Y. 111, 45 N.E. 388.

Even if notice, as described in the specifications, be a condition precedent to jurisdiction of an Admiralty Court of this controversy (which I hold it is not), there has been substantial compliance with that provision.

Paragraph KK, page 41 of the contract, provides as follows: "If the Contractor shall claim compensation for any damage sustained by reason of any act or omission of The City, its agents, or of any other person, or should the Contractor claim that any work required of him is not required to be performed by the provisions of this contract, he shall, within five days after sustaining such damage * * * make and deliver to the Commissioner a written statement of the nature of the damage sustained and of the basis of the claim against The City. On or before the fifteenth of the month succeeding that in which any such damage shall have been sustained or such alleged extra work required to be performed by the Contractor shall have been ordered to be performed, the Contractor shall make and deliver to the Commissioner a written itemized statement of the details and amount of such damage; duly verified by the Contractor. Unless such statements shall be made and delivered within the times aforesaid, all claims for such compensation shall be forfeited and invalidated and the Contractor shall not be entitled to payment on account of such claims."

■ That paragraph has no relation to the contract for furnishing a scow, but relates to that portion of the form of the contract which has to do with the performance of work by the Contractor, but, even if it has, the City has used the form of contract here in question for years, for the charter of scows, and it has recognized its liability for the damage where incoming and outgoing surveys have been held. This seems to me to be a practical construction by the City of the terms of the contract, which I will follow.

■ There was a contention on behalf of the City that it had been prejudiced by the delay in the holding of the outgoing survey, but that contention was not sustained. The charter period ended March 13, 1941, the outgoing survey was originally called for March 18, 1941, and Mr. Birmingham, an official of the Department of Docks, testified that because of bad weather, the regular outgoing survey was adjourned by mutual agreement, until March 24, 1941, when it was held, and the only survey held on March 18, 1941, was the collision damage.

Paragraph GG, page 40 of the said contract, on which the City does not rely, relates to damages caused by other contractors, and it requires no extended consideration, as there is no evidence in this case showing that the damage was caused by another contractor.

The City has failed to explain the damage, and is liable.

No evidence of negligent towage by any equipment, owned or operated by respondent-impleaded, was produced at the trial.

■ A tug is only liable for damage to her tow due to the tug's negligence, and the burden of proof is on the one asserting it. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

■ The respondent-impleaded is not liable.

■ The libellant is without fault or blame.

■ The respondent is wholly and solely liable to the libellant on the contract for the damages to the "G-4" while in possession of the City under the said contract, which was the charter, except for the collision damages received by the "G-4" in collision with the Samson which were surveyed on March 18, 1941, and for which the respondent is not liable.

A decree should be entered in accordance with this opinion in favor of the libellant against the respondent, the City of New York, with costs and the usual order of reference, and in favor of the respondent-impleaded, Moran Towing & Transportation Company, Inc., dismissing the libel and petition as to it with costs against the City of New York, the petitioner.